126 Cal.Rptr.2d 836 (2003)
103 Cal.App.4th 557
The PEOPLE, Plaintiff and Respondent,
v.
Kenneth Ian EDMONTON, Defendant and Appellant.
No. C036988.
Court of Appeal, Third District.
November 6, 2002.
Review Granted January 22, 2003.
*837 Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Senior Assistant Attorney General, W. Scott Thorpe, Supervising Deputy Attorney General, Clayton S. Tanaka and Jane N. Kirkland, Deputy Attorneys General, for Plaintiff and Respondent.
Ishikawa Law Office and Brendon Ishikawa, under appointment by the Court of Appeal, for Defendant and Appellant.
Certified for Partial Publication.[*]
RAYE, Acting P.J.
Defendant Kenneth Ian Edmonton appeals his commitment under the Sexually Violent Predators Act (SVPA). (Welf. & Inst.Code, § 6600 et seq.) A jury found defendant guilty of two sexually violent offenses and likely to engage in future sexually violent criminal behavior as a result of a diagnosed mental disorder. The trial court ordered defendant committed for two years to the custody of the State Department of Mental Health as a sexually violent predator (SVP). (Welf. & Inst. Code, § 6604.) Defendant appeals, challenging the sufficiency of the evidence, alleging instructional error, and arguing the court erred in permitting expert testimony regarding psychological instruments without proof of reliability or general acceptance within the scientific community. We shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
In December 1999 the Sacramento County District Attorney filed a petition for the extension of defendant's commitment as an SVP. (Welf. & Inst.Code, § 6604.) The petition alleges defendant previously had been convicted of two sexually violent offenses within the meaning of Welfare and Institutions Code section 6600, subdivision (b): a 1974 rape in Nevada and the commission in 1989 of lewd and lascivious acts on a child under the age of 14.[1] The petition also alleges defendant suffers a current medical disorder making him likely to commit a sexually violent offense upon release from custody.
A jury trial followed. Defendant admitted a 1974 conviction by a Nevada jury of one count of rape by force and two counts *838 of robbery by force. The Nevada court sentenced defendant to 15 years in prison on the rape charge.
Defendant also admitted that in 1990 a jury convicted him of nine counts of lewd and lascivious acts with a child under the age of 14. (Pen.Code, § 288, subd. (a).) The court sentenced defendant to 19 years in prison. Because defendant's appeal centers on this second prior conviction, we shall provide some detail of the offenses from the preliminary hearing transcript.
In June 1989 defendant offered to watch an employee's two children, 10-year-old C. and eight-year-old V., over the weekend. After arriving at defendant's apartment and going swimming, C. changed out of her bathing suit. While she changed her clothes, defendant entered the bedroom.
After she put on bike pants and a cropped top, C. did a handstand. Defendant held her waist and flipped up her cropped top, saying "look at your little boobies." C. then wrestled with defendant in the living room in front of a video camera. Defendant offered her $100 if she could pin him. After they wrestled, defendant gave V. a beer and C. a wine cooler. Defendant said he would give C. $5 for each glass of wine cooler she drank. C. drank three or four glasses of wine cooler.
Defendant gave C. see-through pajamas belonging to his wife and asked her to try them on. After C. put them on over her own pajamas, defendant told her the pajamas should be worn without anything underneath. C. took off the wife's pajamas because she did not think it was appropriate for someone her age to be wearing something like that.
Defendant played a pornographic video for C. and V. After watching the video, the three of them went to bed, with defendant lying between C. and V. After V. fell asleep, defendant rubbed C.'s left breast, thigh, and bottom. C. moved away from defendant, but defendant pulled her back and kissed her.
At trial on the petition to commit defendant as an SVP, the prosecution presented testimony by two mental health experts. Dr. Elaine Finnberg, a licensed psychologist, evaluated defendant and concluded he suffered from a current mental disorder making it likely he would commit future sexually violent acts if not treated or held in custody. Finnberg testified defendant suffered from two diagnosable mental disorders: paraphilia involving sexual interests focused on nonconsenting adults or children, and personality disorder with antisocial and borderline features arising out of personality traits that have become chronic.
Finnberg based her paraphilia diagnosis on the 1974 rape conviction and the 1990 lewd and lascivious acts conviction as well as on videotapes belonging to defendant that depicted sexual activity between defendant and young girls or defendant and women who were not aware they were being videotaped. Finnberg based her personality disorder assessment on defendant's criminal history, including nonsexual offenses, and defendant's planning of the 1989 offenses.
Finnberg also testified defendant received a score on the Static-99 diagnostic tool that indicated a likelihood of future sex offenses. She testified, however, that she put "very little" weight on the Static-99 in reaching her conclusion.
The prosecution's other expert, Dr. Kathleen Longwell, concluded that based on her evaluation of defendant, he met the criteria for commitment as an SVP. Longwell based her opinion on research data regarding sexual recidivism in known sex offenders.
*839 Longwell administered the RRASOR (Rapid Risk Assessment for Sexual Offense Recidivism) and Static-99, actuarial instruments adopted by the Department of Mental Health. These actuarial instruments suggested defendant could be categorized with a group of persons who are anticipated to be likely to reoffend. Longwell also considered defendant's denial that he was at risk of reoffending, his lack of remorse, and his tolerant attitude toward child molestation.
Longwell concluded defendant suffers from "paraphilia not otherwise specified and personality disorder not otherwise specified with narcissistic and antisocial traits," which render him likely to engage in future sexually violent behavior.
Defendant testified in his own behalf. He denied committing the 1974 rape in Nevada.
Defendant also testified his actions in 1989 involving C. had been misinterpreted. He admitted "frolicking" with C. but denied commenting on her breasts; offering his wife's pajamas; providing alcohol; showing pornographic videos; or touching her breasts, thigh, or buttocks. He explained the video of the pair wrestling resulted from V.'s playing with the video camera. The defense argued that defendant utilized neither force nor duress on C. The defense noted C. testified at the earlier trial that the alcohol did not cause her to feel drunk.
The defense also presented testimony by Dr. Theodore Donalson, a clinical psychologist specializing in forensic psychology. Donalson evaluated defendant and reviewed the reports of Drs. Finnberg and Longwell. In Donalson's opinion, defendant should not be diagnosed as suffering from paraphilia.
According to Donalson, the DSM-IV's (American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)) definition of paraphilia includes elements of guilt and remorse over crimes committed. Donalson found defendant's history revealed no guilt or remorse over the 1974 or 1989 offense. Further, according to Donalson, with paraphilia, there has to be some indication the person is "compelled" to the behavior. Donalson discovered no evidence that defendant did not freely choose to engage in the behaviors for which he was convicted. Donalson testified no pattern connected the 1974 and 1989 offenses that would allow for a paraphilia not otherwise stated as defined by the DSM-TV. Ultimately, Donalson found defendant not compelled to commit sex offenses.
Donalson further testified that the screening instruments used by Finnberg and Longwell did not predict whether or not the future sexual offense would involve violence. He stated the screening instruments, including the Static-99 and the RRASOR, do not predict whether defendant is likely to reoffend, but rather project the recidivism rate of a statistically similar group. Donalson concluded these screening instruments fail to accurately reflect a defendant's potential as an SVP.
The jury found the allegations of the two prerequisite offenses to be true and found defendant likely to engage in future sexually violent criminal behavior as a result of a diagnosed mental disorder. The court ordered defendant committed for two years to the custody of the State Department of Mental Health. Defendant filed a timely notice of appeal.

DISCUSSION

I.[**]

II. Reliance on Legally Insufficient Theory
Defendant contends "[t]he prosecution relied on a legally insufficient theory *840 offered to prove the duress element required for a forcible offense under the SVPA." Defendant concedes the prosecution may present two or more alternative theories of the case but argues that when one theory fails to meet the legal requirements for an SVP commitment, the reviewing court must determine which theory the jury used to convict. If the record does not conclusively prove the jury based its verdict on a legally correct theory, reversal must follow. (People v. Guiton (1993) 4 Cal.4th 1116, 1121-1122, 1128, 17 Cal.Rptr.2d 365, 847 P.2d 45.)
According to defendant, the prosecution improperly relied on the requirement of duress. During closing argument, the prosecution stated: "Duress. Duress is an interesting definition because it is broader than what we normally would think, and just so you know, duress means, and the instruction is disjunctive in the sense it gives you multiple options. Duress means a direct or implied, it says threat of force which doesn't apply here, violence, which doesn't apply under duress, danger which doesn't apply under duress, these facts, but hardship would apply, [¶] What hardship was applied? She was given alcohol. A ten-year-old girl was given four glasses of a wine cooler, as she said, three to four glasses of wine cooler. And this hardship must coerce a reasonable person of ordinary susceptibilities. That is not you or I, but of a ten-year-old girl, to, one, perform an act which otherwise would not have been performed. She said I didn't want to do these things, or, and again, in the ... alternative acquiesced to one which otherwise would not have submitted. What took place after she was given alcohol by the defendant? He groped her breasts, he put his hand on her thigh, he continued to molest her on the bed. Doing it under those circumstances is evidence of duress. [¶] You may think of duress in terms of menacing, threatening manners. It isn't that narrow, and you have the definition. It is going to be your job to see whether or not these facts fit within that, the definition. Regardless of what I say, regardless of what [defense counsel] says, that is a factual determination that you must make."
During jury deliberations, the jury asked the court: "Can we get a definition of hardship under duress?" The court responded: "Hardship has a common meaning. Please use the common meaning of hardship."
Defendant, relying on People v. Green (1980) 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (Green), argues the prosecution relied on a legally insufficient theory requiring reversal. Because the record does not establish that the jury based its verdict on a legally correct theory, defendant argues we must reverse.
In Green, the jury convicted the defendant of first degree murder and found true the special circumstance of murder committed during a robbery and kidnapping. At trial, the People argued the jury could base its kidnapping verdict on any or all of three distinct segments of asportation of the victim. (Green, supra, 27 Cal.3d at pp. 62-63, 164 Cal.Rptr. 1, 609 P.2d 468.) The Supreme Court found the trial court misinstructed the jury on the law as to the first segment. (Id. at pp. 64-65, 164 Cal.Rptr. 1, 609 P.2d 468.) The second segment, a 20-mile asportation, was sufficient to support the kidnapping verdict. (Id. at pp. 62-63, 67, 164 Cal.Rptr. 1, 609 P.2d 468.) However, as to the third and final segment, a walk of 90 feet to the murder site, the Supreme Court found it insufficient as a matter of law to support the verdict. (Id. at pp. 63, 65, 67-68, 164 Cal.Rptr. 1, 609 P.2d 468.) Since the jury could have based its kidnapping conviction on this legally insufficient evidence of asportation, *841 the Supreme Court reversed the conviction. (Id. at pp. 68-69, 73-74, 164 Cal. Rptr. 1, 609 P.2d 468.)
According to defendant, the prosecutor improperly relied on a theory of hardship derived from defendant's plying C. with alcohol to establish that defendant used force. The court, according to defendant, compounded the error by advising the jury to employ the common meaning of hardship. As defendant points out, the Legislature removed "hardship" from the definition of "duress" as to the crime of forcible rape and rewrote the spousal rape statute to include an identical definition. (Stats. 1993, ch. 595, §§ 1, 2, pp. 3120-3122, amending Pen.Code, §§ 261, 262.) Defendant contends the change reflects the Legislature's express desire to delete hardship as a permissible basis for finding duress in any sex crime.
Defendant's perception of legislative intent lacks an essential foundation: statutory language. Penal Code section 261, subdivision (b) states: "As used in this section, `duress' means...." (Italics added.) Penal Code section 262, subdivision (c) mirrors this language and states: "As used in this section, `duress' means...." (Italics added.) This language unequivocally limits these definitions of duress to Penal Code sections 261 and 262. "When a statute is unambiguous, its language cannot `be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. [Citation.]' [Citation.]" (Shah v. Glendale Federal Bank (1996) 44 Cal.App.4th 1371, 1374, 52 Cal. Rptr.2d 417.)
Moreover, case law defining duress for purposes of Penal Code section 288 defines the term to include hardship. (People v. Pitmon (1985) 170 Cal.App.3d 38, 50, 216 Cal.Rptr. 221.) Repeals by implication are not favored. (Scott Co. v. Workers' Comp. Appeals Bd. (1983) 139 Cal.App.3d 98, 105, 188 Cal.Rptr. 537.) We therefore assume that when the Legislature amended the definitions of "duress" for purposes of Penal Code sections 261 and 262, it was aware of the existing case law that defined "duress" differently for purposes of Penal Code section 288 and chose to leave the section 288 definition of "duress" untouched.
We are mindful of the contrary decision in People v. Valentine (2001) 93 Cal. App.4th 1241, 113 Cal.Rptr.2d 748 (Valentine). Valentine examines the legislative history and concludes that the Legislature intended to exclude "hardship" from the list of threatened harms that qualify as forcible oral copulation or forcible penetration with a foreign object because it removed "hardship" from the definition of "duress" for purposes of forcible rape and spousal rape. (Id. at pp. 1248-1250, 113 Cal.Rptr.2d 748.) The court acknowledged the Legislature "did not bother" to amend Penal Code sections 288a and 289, "or any other major sex crime statutes," to incorporate the statutory definition of duress crafted into the forcible rape and spousal rape statutes. (Valentine, supra, 93 Cal. App.4th at p. 1248, 113 Cal.Rptr.2d 748.) But the court concluded "it appears absurd to interpret the statutory scheme as allowing a threat of hardship to justify a conviction for forcible digital penetration or oral copulation but not for forcible rape or spousal rape." (Ibid.)
The court's conclusion is based on its divination of the Legislature's reasons for amending Penal Code sections 261 and 262. According to Valentine, the Legislature amended the statutes in an attempt to bring the crime of rape in line with other *842 major sex crimes. The court concluded: "The fact this statutory definition of `duress' resulted from an attempt to align the elements of rape and other major sex crimes is a further reason for applying that definition to these other sex crimes and not to confine it to rape. As the Penal Code chapter defining all these major sex crimes is presently organized, duress is defined in the earlier code sections, 261 and 262, then used in succeeding sections, without definition, as one of the potential bases for finding a defendant guilty of these other crimes. It is conceivable, barely, the Legislature intended one definition of duress for rape and another broader definition for the other major sex crimes. But it is far more probable the definition they provided in the early sections of this chapter is the one the lawmakers intended courts and jurors to apply every time the term is used in the chapter. The express purpose of amending the rape sections was to make them identical to the other major sex crimes and allow a conviction for rape to rest on the same finding of duress as would justify conviction for one of the other major sex crimes. We would defeat that purpose were we to construe 'duress' in sections 288a and 289, subdivision (a) differently and more broadly than this same term is defined in sections 261 and 262. In doing so, we would reinstate the problem the Legislature intended to cure in the early 1990's." (Valentine, supra, 93 Cal.App.4th at p. 1249, 113 Cal. Rptr.2d 748.)
We disagree with Valentine's analysis and harken back to the basic rules of statutory interpretation. The key is applying the rules in the proper sequence. First, we examine the actual language of the statute. In examining the language, we give the words of the statute their ordinary, everyday meanings, unless the statute itself specifically defines those words to give them special meanings. If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. In such cases, there is nothing to interpret or construe. But if the meaning of the words is not clear, we take the second step and refer to the legislative history. The final step, which is to be taken only when the first two steps have failed to reveal clear meaning, is to apply reason, practicality, and common sense to the statutory language. (U.D. Registry, Inc. v. Municipal Court (1996) 50 Cal.App.4th 671, 674, 57 Cal.Rptr.2d 788.)
In the present case the rape statutes define "duress" for the purposes of those statutes only. Case law has defined "duress" for purposes of forcible lewd conduct. We find no ambiguity, doubt, or uncertainty in the statutes. We discern nothing to interpret that requires us to delve into the legislative history. As to the purported "absurdity" in applying differing definitions of duress, we agree with the concurring opinion in Valentine that "[t]he Legislature may very well have had good reason to retain `threat of hardship' as inclusive in the term `duress' under the aforementioned Penal Code sections." Valentine, supra, 93 Cal.App.4th at p. 1255, 113 Cal. Rptr.2d 748 (cone. opn. of Woods, J.).)
In sum, we reject defendant's attempt to impute legislative intent from one statute to another and find the prosecution did not rely on a legally insufficient theory in establishing the element of duress in the present case. In doing so, we respectfully disagree with the analysis of Valentine, supra, 93 Cal.App.4th 1241, 113 Cal. Rptr.2d 748.

*843 III.-IV.[***]

DISPOSITION
The judgment is affirmed.
We concur: MORRISON and HULL, JJ.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III, and IV of the Discussion.
[1] Defendant was convicted in 1990 for the 1989 offenses.
[**] See footnote *, ante.
[***] See footnote *, ante.