129 Cal.Rptr.2d 583 (2003)
105 Cal.App.4th 774
The PEOPLE, Plaintiff and Respondent,
v.
Richard A. MINSKY, Defendant and Appellant.
No. B155109.
Court of Appeal, Second District, Division Eight.
January 23, 2003.
As Modified February 20, 2003.
Review Granted April 16, 2003.
Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.
*584 Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Theresa A. Cochrane, Deputy Attorney General, for Plaintiff and Respondent.
RUBIN, J.
Richard A. Minsky appeals from the judgment entered after a jury convicted him of numerous counts of rape and other sex crimes. For the reasons set forth below, we affirm the judgment.

FACTS AND PROCEDURAL HISTORY[1]
Between June and October 1998, Richard A. Minsky caused four women to submit to various sex acts by duping them into believing it was the only way to keep their husbands or other loved ones out of jail. Although each incident differed in minor respects, the overall scheme was the same. The women received a phone call in the morning and heard a whispered voice on the other end of the line stating that the caller was under arrest, either for unspecified reasons or for hit and run driving after striking a pedestrian. Two of the womenSherry F. and Patricia N.believed the callers were their husbands. Jill H. thought it was her daughter and Rika H. believed it was her roommate, a close friend she considered to be like family. Each was told to speak to the caller's lawyer, who would explain the situation or tell them what to do.
The women then heard another voice on the line, a man who identified himself as a lawyer. The lawyer told them their loved one was facing mandatory jail time for hit and run driving but said there might be one way outto meet with either the accident victim or with an eyewitness and persuade that person to drop the matter or decline to testify. The lawyer suggested to three of the victims that they pay off the witness or accident victim. As to all four, he either directly stated or strongly implied that sex would be a factor in dissuading the person they were to meet.[2] All four women agreed to the meeting and drove to a designated location. When they arrived, Minsky approached their cars and identified himself by the prearranged code name of "Abraham Lincoln." Minsky would then get in the car and direct the victim to drive somewhere quiet, where they could talk. Minsky initially rejected each victim's offer of money[3] and, at various points during their conversations stated it was his duty to report what had *585 happened, actually starting to leave on two occasions. Eventually, Minsky let it be known that he wanted sex, and the women submitted to various sex acts.[4]
The women later learned they had been tricked by Minsky, who apparently played all three roles in his sexual con gamethe loved one in jeopardy, the lawyer and the supposed eyewitness or hit and run victim. Minsky was later identified, arrested, and charged with numerous counts. Those relevant here are: as to Sherry F., one count of genital penetration by a foreign object (PemCode, § 289, subd. (a)),[5] and two counts of oral copulation (§ 288a, subd. (c)); as to Patricia n., four counts of genital or anal penetration (§ 289, subd. (a)), two counts of oral copulation (§ 288a, subd. (c)), and two counts of rape (§ 261, subd. (a)(2)); as to Rika N., one count of genital and anal penetration (§ 289, subd. (a)) and one count of oral copulation (§ 288a, subd. (c)); and, as to Jill H., one count of genital or anal penetration (§ 289, subd. (a)).[6] The prosecution contended that those sex acts were the product of duress and therefore nonconsensual. A jury convicted Minsky of all counts and he was given a combined state prison sentence of 146 years to life.
On appeal, Minsky contends that the threatened imprisonment of the victims' loved ones could not constitute duress for purposes of the various sex crimes statutes and that the victims' decision to engage in sexual encounters with him was not reasonable, thereby precluding a finding that they acted under duress.

DISCUSSION

1. Duress By Threat of Jail Time

Rape is sexual intercourse accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. (§ 261, subd. (a)(2).) For purposes of the rape statute, duress is defined as "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b).) Oral copulation and genital or anal penetration by a foreign object are also criminal if they are accomplished by *586 duress. (§§ 288a, subd. (b)(2); 289, subd. (a)(1).) Neither statute defines duress, however.
Minsky contends that the looming imposition of what appeared to be justified jail time for hit and run driving did not amount to a threat of violence, danger or retribution for purposes of the rape statute. He arrives at this conclusion by a curious routethe Legislature's amendment of the rape statute to remove a threat of "hardship" from the definition of duress. (See Historical and Statutory Notes, 48 West's Ann. Pen.Code (1999 ed.) fol. § 261, p. 183; People v. Valentine (2001) 93 Cal.App.4th 1241, 1248, 113 Cal. Rptr.2d 748 (Valentine).)[7] According to Minsky, the prospect of legitimate jail time posed no more than a threat of hardship to the victims and their loved ones and, as a matter of law, could not amount to duress under section 261, subdivision (b). We disagree. As set forth below, we believe Minsky's conduct posed a threat of danger or retribution within the meaning of that provision.
The term "danger" is not defined by section 261. The dictionary defines it as "exposure or liability to injury, pain [or] harm. . .." (Webster's 9th New Collegiate Diet. (1988) p. 324.) Minsky's victims were led to believe that if they did not perform sexual favors for him, he would testify against their loved ones, resulting in a certain prison term. Patricia N. believed her husband would be raped or killed in jail and was in terrible danger. Sherry N.'s husband was a former policeman and she believed that as a result he would be physically harmed while in jail. Jill H. pleaded with Minsky not to hurt her daughter. It is common knowledge that prison is a dangerous place where inmates are the frequent targets of violence. (People v. Pifer (1989) 216 Cal.App.3d 956, 960-961, 265 Cal.Rptr. 237 [prisoners have limited protections against body cavity searches because jail "is a unique place fraught with security dangers," where the smuggling or fashioning of weapons are common knowledge and pose serious security dangers]; see People v. Perez (1973) 9 Cal.3d 651, 108 Cal.Rptr. 474, 510 P.2d *587 1026 [young man in county jail subjected to numerous sexual assaults]; Wheeler v. Plumas County (1906) 149 Cal. 782, 788, 87 P. 802 [tax payment made under threat of prison sentence was made "in duress of imprisonment, and to procure [plaintiffs] liberation from such imprisonmentfrom a danger urgent and immediate . . ."].) Based on this, we hold that Minsky's four victims submitted to his sexual demands under duress based on the danger their loved ones faced should they be incarcerated.[8]
We alternatively hold as to Patricia N. that she acted under a threat of retribution. Although retribution can mean the dispensation of reward or punishment (Webster's 9th New Collegiate Diet. (1988) p. 1007), we believe it is most commonly understood as a form of payback or revenge. Patricia N. believed she was meeting with the victim of her husband's hit and run accident. In that context, Minsky's threat to put her husband in jail unless she gave in to his sexual demands amounts to duress by a threat of retribution for purposes of the rape statute.
As for the oral copulation and genital and anal penetration offenses, decisions construing those statutes have held that a threat of hardship will suffice to establish duress. (People v. Senior (1992) 3 Cal. App.4th 765, 775, 5 Cal.Rptr.2d 14 [§§ 288a; 289]; People v. Bergschneider (1989) 211 Cal.App.3d 144, 154, 259 Cal. Rptr. 219 [§ 288a]; Pitmon, supra, 170 Cal.App.3d at pp. 50-51, 216 Cal.Rptr. 221 [§ 288, subd. (b) ].)
Relying on recent case authority, Minsky contends that the statutory definition of duress for rape in section 261, which now excludes hardship, applies to the other sex offense statutes. (Valentine, supra, 93 Cal.App.4th at pp. 1249-1252, 113 Cal. Rptr.2d 748.) Respondent contends it does not, pointing to the language of section 261, which defines duress "[a]s used in this section . . .."(§ 261, subd. (b).) Assuming for discussion's sake only that Minsky is correct, because we hold that his ploy constituted duress by threat of danger or retribution under section 261, we also hold that it constituted duress under sections 288a and 289.[9]

2. Reasonableness of Victims' Conduct

The jury was required to determine whether the duress Minsky created was "sufficient to coerce a reasonable person of ordinary susceptibilities to perform *588 an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b); People v. Senior, supra, 3 Cal.App.4th at p. 775, 5 Cal. Rptr.2d 14.) Minsky contends that his victims did not pass this reasonableness test because each testified she had certain doubts about the credibility of Minsky's story and was essentially willing to engage in an illegal cover-up of a crime.
"The very nature of duress is psychological coercion. . .." (People v. Cochran (2002) 103 Cal.App.4th 8, 15, 126 Cal. Rptr.2d 416.) The defendant in People v. Cardenas (1994) 21 Cal.App.4th 927, 26 Cal.Rptr.2d 567 (Cardenas), was convicted of numerous sex crimes after posing as a curanderoa holy man and healer to believers of certain folk religions in Mexico and Central America. Using his spiritual authority, he convinced several female adherents of that faith to live with him. During a six-month period, he weakened them with a combination of medications, dietary restrictions and sleep deprivation. The women were isolated from others and totally dependent on the defendant for their needs. Under those circumstances, their submission to his sexual demands was the product of duress, the court held. (Id. at pp. 938-940, 26 Cal.Rptr.2d 567.) We believe Minsky accomplished much the same result, albeit by less drastic means in a far shorter time.
Instead of a slow boil, Minsky forced his victims into the pressure cooker of a rapidly-unfolding "emergency" that required immediate action. Each victim was led to believe she was talking to her particular loved one, who briefly described the trouble he was in, then directed the victim to talk to the "lawyer" and follow his advice.[10] After mentioning the jail terms their loved ones facedin some cases up to 15 yearsthe "lawyer" told the victims they had to act fast to free them.[11] The victims were then isolated in two ways: First by the "lawyer," who warned them not to tell anyone what was going on; next by the supposed accident victim or witness, who got in their cars and had them drive around before directing them to secluded or out-of-the-way locations. The final bit of torque was applied by Minsky's apparent Hamlet-like dithering over his moral and civic obligation to testify about what happened, which sometimes included his feigned departure. When all the circumstances are considered, we believe there was sufficient evidence for the jury to find that Minsky brought to bear enough psyetiological *589 pressure to coerce a reasonable person to act as his victims did.
Minsky's final challenge to this element of duress is essentially a legal one: that as a matter of law a reasonable person would not have submitted to his sexual demands in order to carry out the unlawful cover-up of a criminal offense. A defendant seeking to clear himself of a criminal charge on duress grounds has a fairly high bar to clearhe must have had reasonable cause to believe his life was in danger if he refused. (§ 26, subd. (6).) When duress is an element of a criminal offense, however, the lower standard first articulated in Pitmon, supra, 170 Cal. App.3d at pp. 48-51, 216 Cal.Rptr. 221, applies. (§ 261, subd. (b); People v. Cochran, supra, 103 Cal.App.4th at pp. 13-14, 126 Cal.Rptr.2d 416; see fn. 7, ante, setting forth legislative history of section 261 and its incorporation of the Pitmon definition of duress.) We believe both standards can rationally coexist in a case such as this. If Minsky's victims in fact committed a crime by tampering with a witness and obstructing justice, they could not raise duress as a defense because their lives were not threatened.[12] That should not absolve Minsky of his crimes, however, which were the result of a reprehensible scheme to coerce his victims to submit to his sexual demands.

DISPOSITION
For the reasons set forth above, the judgment is affirmed.
We concur: COOPER, P.J., and BOLAND, J.
NOTES
[1] In accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103.)
[2] The lawyer asked Sherry F. to rate her looks on a scale of one to ten, urged her to dress provocatively, and said, "Look, you are a grown woman. He's a grown man. You know, you just have to play your femininity and see what you can do to convince him . . . not to press charges." The lawyer told Patricia N. she had three optionscompensate the pedestrian for his trouble, get him drunk, or seduce him. She was asked to rate her looks and told to dress provocatively. Rika H. was told to "use her womanhood," and was also asked about her looks and told to dress sexily. Jill H. was told that it was important to make the witness like her. To that end, she was told to dress sexily, wear a short skirt and "show a lot of leg. . .."
[3] When Rika H. offered Minsky money, he pulled out a wallet full of cash and told her he did not need money. He eventually agreed to both cash and sexual favors in exchange for not going to the police. When Jill H. offered to give Minsky money, he replied that "money is not the only thing" and suggested "a package" including non-monetary compensation.
[4] When Sherry F. tried to convince Minsky to stay, he placed his hand on her knee. She then understood he wanted some type of sexual contact. Soon after, he told her to drive away from where they were parked and directed her to a motel, where they engaged in various sex acts. After Minsky rejected Patricia N.'s offer of money, he complimented her on the dress she wore. Patricia then knew Minsky wanted sexual contact, which was the only way to keep her husband out of jail. She initiated sexual contact with Minsky, asking him "[i]f I do this, will you drop the charges on my husband?" He eventually agreed not to press charges if they went to a motel, stating the deal was off if she did not achieve orgasm. Minsky told Rika H. he would not go to the police if she gave him both sex and money. Jill H. hugged Minsky in response to his claim that he was a "nervous wreck." He then put his hand on her breast and inserted a finger in her vagina.
[5] All further section references are to the Penal Code unless otherwise indicated.
[6] Minsky also obtained money from Rika H. and Jill H., and either obtained or tried to obtain money from several other women through his scheme. In addition to the sex crimes, he was also charged with grand theft (§ 487, subd. (a)) as to Rika H. and Jill H., and with grand theft and attempted grand theft (§§ 664/487, subd. (a)) as to the other women. He was convicted on those counts, but they are not at issue here.
[7] People v. Pitmon (1985) 170 Cal.App.3d 38, 216 Cal.Rptr. 221 (Pitmon), was the first reported decision to construe the meaning of duress as an element of a crime, in that case as an aggravating factor for lewd and lascivious conduct on a minor under section 288. Pitmon held that duress consisted of a threat of force, violence, danger or hardship (id. at p. 50, 216 Cal.Rptr. 221), a definition that was added to the CALJIC instruction on section 288. (Use Note to CALJIC No. 10.42 (6th ed.1996) p. 798.) The Legislature did not include duress as a means of committing rape until 1990. (Stats. 1990, ch. 630 (S.B. 2586), § 1.) When casting about for a definition of duress, the Legislature settled on the one used in CALJIC No. 10.42, using the Pitmon language almost verbatim. (Pitmon, supra, 170 Cal.App.3d at pp. 50-51, 216 Cal. Rptr. 221; CALJIC No. 10.42; Assem. Com. on Public Safety, Analysis of Sen. Bill 2586 (1990 Reg. Sess.) July 3, 1990, p. 2; copy of CALJIC No. 10.42, which appears in the legislative history documents.) The purpose of the amendment adding duress to the rape statute was to conform that provision with other sex assault crimes. (Sen. Com. on Judiciary, History of Sen. Bill No. 2586 (1990 Reg. Sess.) April 3, 1990; Sen. Roberti, sponsor of Sen. Bill 2586 (1990 Reg. Sess.), letter to Governor, Sept. 7, 1990.)

Our review of the legislative history shows that when hardship was eliminated from section 261 in 1993 (Stats.1993, ch. 595 (A.B. 187), § 1), it was done without comment or explanation. The purpose of that legislation was to expand the definition of spousal rape (§ 262) by conforming it to the current definition of rape under section 261. (Dept. of Finance, Analysis of A.B. 187 (Reg.Sess.1993) May 14, 1993, p. 1.) With that in mind, we find it hard to understand why the Legislature seemingly narrowed the definition of duress in section 261. As set forth below, however, we need not address either the Legislature's intent in doing so or its effect on this case.
[8] If Minsky had used the same means to persuade his victims to turn over the deeds to their homes or agree to buy goods from him, there is no question that those transactions would be void as a result of duress. (Civ. Code, § 1579; Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian (1990) 218 Cal.App.3d 1058, 1077-1079, 267 Cal.Rptr. 457 [contracts made under threat of even legal imprisonment may be voided for lack of consent due to duress].) We do not rely on these authorities (see Pitmon, supra, 170 Cal. App.3d at p. 49, fn. 6, 216 Cal.Rptr. 221 [rejecting applicability of contract law principies]) but mention them to point out the apparent absurdity of holding that the same conduct that would preclude consent from entering contractual relations would not preclude finding consent to sexual relations.
[9] Respondent relied on People v. Edmonton (2002) 103 Cal.App.4th 557, 126 Cal.Rptr.2d 836, which disagreed with Valentine, holding that the section 261 definition of duress was limited to that statute and did not trump the case law definition for other sex crimes, which includes hardship. The Supreme Court recently granted review in that case. (Rev. granted January 22, 2003, S112168.) Even though we do not reach the question whether the section 261 definition of duress applies to other sex crimes, we agree with the Valentine court that there seems to be no good reason for the Legislature to establish inconsistent definitions of duress for different sex crimes. (Valentine, supra, 93 Cal.App.4th at p. 1249, 113 Cal.Rptr.2d 748.) Whatever the Legislature's intent, however, we believe legislation to clarify the matter may be warranted.
[10] Jill H. was told by her "daughter" that she was "in a lot of trouble" and that Jill H. should "[t]alk to this lawyer." Patricia N. heard her "husband" crying with fear and was told to speak with his lawyer and "do whatever it took to convince this pedestrian to drop the charges." Sherry F. was told by her "husband" to talk to the lawyer and "just do everything he tells you to do." Rika H. heard her close friend sobbing at the other end of the phone line, saying she was in big trouble and asking Rika H. to talk to her lawyer.
[11] Jill H. was told that the witness was visiting from New York, was ready to leave for home, and that she needed to meet with him "right now." Patricia N. was told that the accident victim was a tourist who might not want to come back for a trial and that she needed to meet with him within the hour. She said the lawyer kept rushing her and felt she did not have time to think. Sherry F. was told that the witness was from out-of-town and was planning to leave for home that night. Rika H. was told that the witness was from the East Coast and wanted to go to the police. When she questioned the lawyer, he became impatient and frustrated, stating he was only trying to help. At one point, he asked how long it would take her to get ready for the meeting. She felt panicked, worried and pressured.
[12] We express no opinion on that point.