130 Cal.Rptr.2d 374 (2003)
105 Cal.App.4th 833
The PEOPLE, Plaintiff and Respondent,
v.
Juan Diego LEAL, Defendant and Appellant.
No. H023031.
Court of Appeal, Sixth District.
February 4, 2003.
Review Granted April 23, 2003.
*376 J. Courtney Shevelson, Carmel, Attorney for Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Gerald A. Engler, Supervising Deputy Attorney General, Allan Yannow, Deputy Attorney General, Attorneys for Respondent.
*375 MIHARA, J.
A jury found defendant Juan Diego Leal guilty of two counts of forcible lewd acts on Jane Doe I, a child under the age of 14 (Pen.Code, § 288, subd. (b)(1)). The jury could not reach a verdict on two alternative child molestation charges involving Jane Doe II.[1] Defendant was sentenced to 12 years in state prison. On appeal he contends the trial court erred by allowing the prosecution to elicit evidence of his response to Deputy Dona because the statement "was the product of custodial interrogation without Miranda[2] warnings and was admitted against [him] in violation of his rights under the Fifth and Fourteenth Amendments." Defendant also contends the trial court erred by failing to instruct the jury on admissions pursuant to CALJIC Nos. 2.71.5 and 2.71 and by defining "duress" to include "a direct or implied threat of `hardship.'" (Emphasis and capitalization omitted.)

I. Facts
In the fall of 1999, 11-year-old Jane Doe I was in the sixth grade. At that time, defendant was the boyfriend of Jane Doe I's aunt Maria, and Jane Doe I had known him a "long time" although she could not recall for "how many years."
Jane Doe I's mother had known defendant for six or seven years. In 1999, defendant volunteered to do some repairs and painting around her house, and she gave him a key in April 1999 so he could work while no one was there. The first thing defendant volunteered to do for the family's San Jose home was to put a doorknob and lock on the bedroom door of Jane Doe I's parents.[3]
Jane Doe I testified that, while she was in the sixth grade, defendant came over to her house to work on it "[e]very day." Sometimes, he already would be there when she and her nine-year-old brother returned after school; other times, the children got home first and defendant would arrive about 4 p.m. Jane Doe I's parents always were at work in the afternoon, and no other adults besides defendant were at the house. When defendant was there and Jane Doe I and her mother would speak by telephone, defendant would tell Jane Doe I "to tell [her] mom that he wasn't there." At first defendant would give her "close hugs" that were "too tight" "every time [she] saw him." When no one else was around, defendant would feel her breasts with his hands, sometimes over her shirt and sometimes under her shirt, touching her skin with his hand. Sometimes, during the hugs, he would touch her "bottom" and move his hand around. "About three times," defendant touched her vagina; twice, when he did so, he put his fingers on her vagina. Defendant also would kiss her, sometimes putting his tongue in Jane Doe I's mouth. He *377 also had her pull down her pants, and he then looked at her and touched her bottom. On several occasions, defendant would take his penis out of his pants and would grab her arm or wrist and have Jane Doe I touch his penis. "About three times," on separate occasions, when she would "hesitate" and pull her hand back, he would "grab" her hand back and put it back on him, saying, "Come on, it's nothing scary." He would move her hand around, making her feel his penis. He also held her wrist and forced her to touch his penis three times. Jane Doe I was "[d]isgusted" by having to put her hand on defendant's penis, but defendant did not hurt her when he pulled her hands back.
These touchings would occur in her mother's bedroom. Some of the molestations took place when Jane Doe I was working on the computer in that bedroom; other times, defendant would tell her that he needed to talk with her in that room. Defendant would enter the room, lock the door, and molest her. "Every time [defendant] came over," he told Jane Doe I not to tell anyone about the molestation because she would not see him anymore if she did so. Jane Doe I interpreted this to mean she "wouldn't be able to see [her] aunt [Maria] anymore," which was a "concern" because Maria was her "closest aunt."
Initially, Jane Doe I would go with defendant into the bedroom, although she knew what was going to happen there, because "[a]t the time [she] was scared." Later, she would try to keep defendant from being alone with her. She would lock herself in her mother's bedroom and pretend she was sleeping, she would pretend she was sick and could not get up off the sofa, or she would say she was tired. She tried locking the front door, but her brother would open it and, in any event, defendant had the key.
In September 1999, Jane Doe I told her mother she felt uncomfortable around defendant because he gave her bear hugs when the family got together. She complained about the hugs more than once, saying they hurt because her breasts were developing. Her mother said she "didn't have to hug him when [she] saw him." When the mother asked if anything else was making her uncomfortable, Jane Doe I said no but she appeared upset that defendant had a key to the house and was being allowed to come over. Jane Doe I also complained to her mother about defendant being at the home when she and her brother were there. When her mother noticed Jane Doe I was "keeping her distance" from defendant and being "rude" to him, Jane Doe I explained that she was acting rudely because defendant was "annoying."
Jane Doe I testified that she did not want her mother to know what defendant was doing because she feared "it would get reported and then [she] would be taken away from [her] mom" as had happened to friends who were taken from their parents after being molested. Jane Doe I conveyed this fear to her friend, Jane Doe II.
Jane Doe I also told Jane Doe II about defendant's behavior. When the two girls would speak on the telephone, Jane Doe I would make a clicking sound to signal that defendant was there. Jane Doe II then would come over so Jane Doe I would not be alone with defendant.
Jane Doe II testified defendant molested her at Jane Doe I's house, that once when she wound up alone with him in the garage, defendant started kissing her and then touched her on her vagina over her clothes. Jane Doe II said defendant also put his hands on her stomach and breasts and grabbed her hands and put them between his legs. When she pulled her arms away, defendant put them by his penis again. Defendant began to unbuckle her *378 pants but stopped when Jane Doe I walked into the room. Jane Doe II was scared during this incident but did not try to move away because she "thought he would be back."
The first adult to whom the girls reported the molestations was their school counselor. That same day, December 7, 1999, the counselor contacted the sheriffs office, and defendant was arrested later in the day.
Dr. Anthony Urquiza, an expert on child sexual abuse, testified for the prosecution regarding child abuse accommodation syndrome, which involves secrecy, a sense of helplessness, entrapment or accommodation, delayed disclosure and retraction. Urquiza said molesters commonly are acquaintances of children they molest, the children are vulnerable to requests to keep secrets since adults are bigger and often in positions of authority, and children often delay reporting abuse because they are afraid or ashamed. He added that children might make a statement and then decide whether to continue with disclosure based upon the response they receive. Children who are in a position where they can do nothing about the molestations cope by trying to manage their feelings. Sometimes they are told a relationship is special and they believe that message. Sometimes children have mixed feelings about their molester and would rather take the risk that goes with sexual abuse rather than disclose the abuse.
Defendant's girlfriend Maria, who is Jane Doe I's aunt, testified on behalf of defendant that defendant interacted with Jane Doe I in a loving way and that nothing "stood out in [her] mind" about the way the two interacted during 1999. They often hugged each other. After Jane Doe I's mother spoke with Maria, Maria asked defendant not to hug Jane Doe I "so tight" because Jane Doe I was tender in the chest area.
Defendant testified on his own behalf as follows. He admitted that he went to Jane Doe I's house once a week and sometimes more often to paint and do repairs but denied ever being at the house alone with Jane Doe I or Jane Doe II. He denied molesting either girl, but he admitted hugging Jane Doe I. He denied ever telling Jane Doe I not to tell her mother he was at the house. He did not know why either girl would falsely claim that he was molesting her. He added that he had not had any conflicts with Jane Doe I.
Defendant testified that, on the date of his arrest, he was at Jane Doe I's house when approached by Deputy Sheriff Carlos Dona. When Dona told defendant had been accused of inappropriately touching two girls, defendant was surprised and scared and asked, "where's the evidence?" Defendant said he made that response because that was what first came to mind as the way to deny the accusation; he meant that he was being accused of something he had not done and that he wanted to know the evidence against him. When asked why he did not phrase his response to say that the accusation was "totally untrue" or to otherwise directly "deny" the accusation, defendant testified that perhaps it was because of his inability to express himself well in English.
Deputy Dona testified as a witness for the defense that, on December 7, 1999, Deputy Guinee, the deputy who had taken statements from the two girls, directed Dona to go to a location on Kenilworth Way regarding the molest allegation. Dona was told defendant possibly would be there. When Dona did encounter defendant at the gate to the side yard, he asked if defendant was Juan Leal and asked for identification. Defendant then produced his California driver's license. During this conversation, Dona had a "[c]asual" demeanor *379 and was talking in the same tone of voice he used during his testimony. He did not have his gun, baton, or pepper spray out, and he was not yelling at defendant. Dona held onto the driver's license "for a while" and checked to see that it was valid. When Dona asked if defendant knew why Dona was visiting him, defendant said, "No." During a brief radio exchange with Deputy Guinee in defendant's presence, Dona was instructed to do an investigative interview. Dona then mentioned that two girls had said defendant had touched them inappropriately and asked if defendant had anything to say about the allegations. Defendant frowned, looked at Dona, and then asked, "Where's the evidence?" Defendant did not ask who was saying this or what they were talking about. Dona did not ask defendant what he meant by that question or why he was asking it. Dona testified that defendant initially did not appear to be shocked or surprised to see him there but that, after he was asked about the molestation allegations, defendant became "agitated" and "angry." Dona then said he was not accusing defendant of anything but just wanted to know if defendant had anything to say about the allegations. Dona also asked if defendant was admitting or denying the inappropriate touching. Defendant denied the accusation and again asked where the evidence was.
No evidence was presented regarding whether Dona still had defendant's license when he asked defendant about the claim of inappropriate touching.

II. Discussion

A. Inclusion of "Hardship" in Definition of "Duress"
Defendant contends the trial court erred by instructing the jury on the meaning of "duress," as used in the definition of counts 1 and 2, committing a forcible lewd act on a child (§ 288, subd. (b)(1)), pursuant to CALJIC No. 10.42 (6th ed.1996).
The trial court instructed the jury that "the term duress means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed, or (2) acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to defendant, are factors to consider in appraising the existence of duress." (Italics added.)
Relying upon People v. Valentine (2001) 93 Cal.App.4th 1241, 113 Cal.Rptr.2d 748 (Valentine), defendant argues that threatened "hardship" no longer remains a form of "duress" justifying a conviction for forcible lewd and lascivious conduct upon a child (§ 288, subd. (b)(1)) and therefore could not be considered by the jury in determining whether there was evidence of duress.[4] For the reasons stated below, we conclude the trial court did not err by including threatened "hardship" as a form of duress in this case.
The definition of "duress" contained in CALJIC No. 10.42 is derived from People v. Pitmon (1985) 170 Cal.App.3d 38, 47-51, 216 Cal.Rptr. 221. (See Comment, CALJIC No. 10.42 (6th ed.1996).) Pitmon involved a prosecution for multiple sex offenses, including section 288, subdivision (b), and sentencing under section 667.6, subdivision (c), which applies to sex offenses *380 committed by means of force or duress. At the time Pitmon was decided, the Penal Code did not define the term "duress" for any of the sex crimes or for section 667.6. The court based its definition on the one given in Webster's Third New International Dictionary (1961) at page 703.
A few years after Pitmon, the court in People v. Bergschneider (1989) 211 Cal. App.3d 144, 259 Cal.Rptr. 219 remarked, "For reasons which escape us, rape is the only major sexual assault crime which cannot be committed by means of duress. (See § 261(2); compare §§ 286(c), 288(b), 288a(c), and 289(a).)" (Id. at p. 152, 259 Cal.Rptr. 219, fn. omitted.) The following year, the Legislature amended the definition of rape in sections 261 and 262 (spousal rape) to include duress, and also added a definition of duress to that statute. (Stats. 1990, ch. 630, § 1.) The definition added to sections 261 and 262 tracked the Pitmon definition. The Legislature did not include a specific definition of duress in any of the other sex crime statutes.
In 1993, the Legislature deleted the term hardship from the definition of duress contained in sections 261 and 262. (Stats.1993, ch. 595, § 1.) The legislative history of that amendment does not state why that change was made. The stated purpose of the bill effecting that change was to ensure that the provisions for spousal rape in section 262 mirror the provisions for non-spousal rape in section 261. (Assem. Com. Pub. Saf. Analysis of Assemb. Bill No. 187 (1993-1994 Reg. Sess.) as amended Feb. 22, 1993.)
Defendant contends that, by deleting the term "hardship" from the definition of "duress" contained in sections 261 and 262, the Legislature intended to amend the definition of "duress" used in the other sex crime statutes such as section 288, subdivision (b).
In Valentine, the appellate court held that duress for the purposes of sections 288a and 289 does not include threat of hardship. The Valentine court reasoned that the relevant legislative history reveals that, by deleting the term "hardship" from the definition of duress provided in sections 261 and 262, the Legislature intended to amend the definition of duress used in all of the sex statutes.
We, however, are not convinced that the fact that the Legislature removed "hardship" from the definition of "duress" as to the crime of forcible rape and rewrote the spousal rape statute to include an identical definition reflects the Legislature's intent to delete hardship as a permissible basis for finding duress in any sex crime.
Penal Code section 261, subdivision (b) states: "As used in this section, `duress' means ..." (Italics added.) Penal Code section 262, subdivision (c), which mirrors this language, states: "As used in this section, `duress' means...." (Italics added.) This language unequivocally limits these definitions of duress to Penal Code sections 261 and 262. "When a statute is unambiguous, its language cannot `be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. [Citation.]' [Citation.]" (Shah v. Glendale Federal Bank (1996) 44 Cal.App.4th 1371, 1374, 52 Cal.Rptr.2d 417.)
Case law defining duress for purposes of Penal Code section 288 defines the term to include hardship (see, e.g., People v. Pitmon, supra, 170 Cal.App.3d 38, 50, 216 Cal.Rptr. 221) and repeals by implication are not favored. (Scott Co. v. Workers' Comp. Appeals Bd. (1983) 139 Cal.App.3d 98, 105, 188 Cal.Rptr. 537.) We therefore assume that when the Legislature amended the definitions of "duress" for purposes of Penal Code sections 261 and 262, it was *381 aware of the existing case law that defined "duress" differently for purposes of Penal Code section 288 and that it chose to leave the section 288 definition of "duress" untouched.
Valentine, 93 Cal.App.4th 1241, 113 Cal. Rptr.2d 748 (Valentine), which held to the contrary, examined the legislative history and concluded that the Legislature intended to exclude "hardship" from the list of threatened harms that qualify as forcible oral copulation or forcible penetration with a foreign object because it removed "hardship" from the definition of "duress" for purposes of forcible rape and spousal rape. (Id. at pp. 1248-1250,113 Cal.Rptr.2d 748.) While acknowledging that the Legislature did not amend Penal Code sections 288a and 289, or any other major sex crime statutes, to incorporate the statutory definition of duress crafted into the forcible rape and spousal rape statutes, the court concluded that "it appears absurd to interpret the statutory scheme as allowing a threat of hardship to justify a conviction for forcible digital penetration or oral copulation but not for forcible rape or spousal rape." (Valentine, supra, 93 Cal.App.4th at p. 1248, 113 Cal.Rptr.2d 748.)
The Valentine court speculates that the Legislature amended the statutes in an attempt to bring the crime of rape in line with other major sex crimes and concludes that "[t]he fact this statutory definition of `duress' resulted from an attempt to align the elements of rape and other major sex crimes is a further reason for applying that definition to these other sex crimes and not to confine it to rape. As the Penal Code chapter defining all these major sex crimes is presently organized, duress is defined in the earlier code sections, 261 and 262, then used in succeeding sections, without definition, as one of the potential bases for finding a defendant guilty of these other crimes. It is conceivable, barely, the Legislature intended one definition of duress for rape and another broader definition for the other major sex crimes. But it is far more probable the definition they provided in the early sections of this chapter is the one the lawmakers intended courts and jurors to apply every time the term is used in the chapter. The express purpose of amending the rape sections was to make them identical to the other major sex crimes and allow a conviction for rape to rest on the same finding of duress as would justify conviction for one of the other major sex crimes. We would defeat that purpose were we to construe `duress' in sections 288a and 289, subdivision (a) differently and more broadly than this same term is defined in sections 261 and 262. In doing so, we would reinstate the problem the Legislature intended to cure in the early 1990's." (Valentine, supra, 93 Cal.App.4th at p. 1249, 113 Cal. Rptr.2d 748.)
We respectfully disagree with the analysis of Valentine, supra, 93 Cal.App.4th 1241, 113 Cal.Rptr.2d 748. Our analysis begins and ends with the basic rules of statutory interpretation, which we apply in their proper sequence. "First, a court should examine the actual language of the statute. [Citations.] ... [¶] In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning [citations] unless, of course, the statute itself specifically defines those words to give them a special meaning [citations], [¶] If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. [Citations.] There is nothing to `interpret' or `construe.' [Citations.] [¶] But if the meaning of the words is not clear, courts must take the second step and refer to the legislative history. [Citations.] [¶] The final stepand one which we believe should only be taken when the first two steps have failed to *382 reveal clear meaningis to apply reason, practicality, and common sense to the language at hand." (U.D. Registry, Inc. v. Municipal Court (1996) 50 Cal.App.4th 671, 674, 57 Cal.Rptr.2d 788, internal quotations omitted.)
The rape statutes define "duress" for the purposes of those statutes only, while case law has defined "duress" for purposes of forcible lewd conduct. Finding no ambiguity, doubt, or uncertainty in the statutes, we find no need to delve into the legislative history. As to the purported "absurdity" in applying differing definitions of duress, we agree with the concurring opinion in Valentine that "[t]he Legislature may very well have had good reason to retain `threat of hardship' as inclusive in the term `duress' under the aforementioned Penal Code sections." (Valentine, supra, 93 Cal.App.4th at p. 1255, 113 Cal. Rptr.2d 748 (cone. opn. of Woods, J.).)
For the reasons stated above, we reject defendant's attempt to impute legislative intent from one statute to another and find that the prosecution relied upon a legally sufficient theory in establishing the element of duress in the present case.

B. Admissibility of Defendant's Response to Deputy Dona
Defendant contends the trial court erred by allowing the prosecution to elicit evidence of his response to Deputy Dona.
After the People rested and before defendant testified, an Evidence Code section 402 hearing was held at which Deputy Dona testified as follows regarding his contact with defendant to investigate the claim that defendant had inappropriately touched two girls. Dona encountered defendant at the side gate leading to the backyard of Jane Doe I's home. Dona was in full uniform, and he was by himself. He asked defendant if he was Juan Leal and asked for identification. Defendant gave Dona his California driver's license. Dona asked if defendant knew why he was there, and defendant said that he did not. Dona did not tell defendant he was under arrest, ask him to stop or stand in any particular spot, or give him the Miranda admonitions. When Dona said he was there to investigate two girls' claims that defendant had touched them inappropriately, defendant became agitated, frowned, and responded, "Where's the evidence?"[5]
Dona replied that he was not accusing defendant of anything but only wanted his side of the story. When defendant appeared to become agitated, Dona again said he was not accusing defendant of anything. Whether he was admitting or denying the allegation, defendant responded in a manner that gave Dona the impression defendant was trying to argue. Defendant then denied the allegation and said he wanted to go inside to make a telephone call. Dona went with defendant while he went inside and made two calls. Dona remained there for a few minutes engaging in "small talk" with defendant while awaiting further instruction from Guinee, who then asked Dona to take defendant to headquarters. Dona asked defendant to downtown with him. Defendant did not indicate in any way that he did not want to go, and Dona did not handcuff defendant on the ride to headquarters.
Dona testified he did not intend to detain defendant when he first encountered defendant, that he only intended to talk with him. Had defendant refused to talk with him, Dona would have done whatever Guinee wanted, but he would not have *383 allowed defendant to walk away had defendant wanted to do so. He said he was there to get defendant's side of the story "if he had one."
The parties stipulated that Dona's report reflected that, when he said two girls had accused defendant of inappropriate touching, Dona asked defendant if he had "anything to say about that." The trial prosecutor conceded Dona's statements to defendant regarding the touching allegations constituted questioning; however, citing California v. Beheler (1983) 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, he argued there was no formal arrest or restraint of movement associated with formal arrest.
The trial court properly recognized that the officer's subjective intent was irrelevant. (See People v. Stansbury (1995) 9 Cal.4th 824, 830, 38 Cal.Rptr.2d 394, 889 P.2d 588.) The court then made factual findings that "[t]his is a conversation going on in a side yard where [Dona] asked [defendant] first a very benign question. He doesn't tell him to stand anywhere, do anything, doesn't put his hands on him, asked for I.D. which is ... something that occurs on a daily basis, but he doesn't direct him to do anything at that point." The court also accepted Dona's testimony that Deputy Guinee had not made the decision to "call for the arrest of [defendant]" until after defendant's question when Guinee directed Dona to bring defendant to headquarters.
The trial court then found that, at the time of defendant's response questioning where the evidence was, the "encounter had not risen to a custodial nature." Accordingly, the court concluded there had not been "a custodial interrogation at that point" and that "the statements can come into evidence in this trial" since the questions Dona asked before defendant's question did not "implicate Miranda at all."
In determining whether the interrogation was custodial, we accept the trial court's factual findings if supported by substantial evidence. We then independently determine whether the interrogation was custodial. (People v. Aguilera (1996) 51 Cal.App.4th 1151, 1161, 59 Cal. Rptr.2d 587.) In making this determination, we consider whether the contact was initiated by the police and, if so, whether the person voluntarily agreed to an interview, whether the purpose of the interview was to interview the person as a witness or suspect, the location of the interview, whether the person was informed he was under arrest or in custody, whether the person was informed he was free to terminate the interview and leave, whether the person's behavior indicated an awareness of such freedom, the person's freedom of movement was restricted during the interview, the length of the interview, the number of officers participating in the interview, whether they controlled the interview's course, whether they manifested a belief the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, or accusatory, whether they tried to pressure the person, and whether the person was arrested at the end of the interrogation. (Id. at pp. 1161-1162, 59 Cal.Rptr.2d 587; see also United States v. Butler (9th Cir.2001) 249 F.3d 1094, 1099.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (Id. at p. 1162, 59 Cal.Rptr.2d 587; see also Thompson v. Keohane (1995) 516 U.S. 99, 112-113, 116 S.Ct. 457, 133 L.Ed.2d 383 [after reviewing circumstances surrounding the interrogation, court must apply objective test *384 to resolve whether there was "`a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest'"].) "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. ... [I]t is the objective surroundings, and not any undisclosed views, that control the Miranda custody inquiry." (Stansbury v. California (1994) 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293.) The mere presence of some coercive elements does not necessarily create a custodial situation. For example, in California v. Beheler, supra, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275, the court held that a coercive environment short of formal arrest or restraint of movement of a degree associated with formal arrest does not constitute custody even if the police announce that the defendant is a suspect and the defendant is interviewed at the police station. (Id. at pp. 1123-1125, 103 S.Ct. 3517.)
Here, Deputy Dona was alone when he encountered defendant at the gate to the backyard of Jane Doe I's house, where defendant often did repair work. The deputy first asked if defendant was Juan Leal and confirmed his identification by examining defendant's California driver's license. Dona spoke to defendant in a casual voice, asking if defendant knew why he was there. When defendant said he did not, Dona mentioned that two girls had accused defendant of inappropriately touching them. It was at that point that defendant frowned and asked, "Where is the evidence?" At the time defendant made this remark, no weapons had been drawn, defendant had not been informed he was under arrest or in custody, he voluntarily agreed to the interview in that he quickly responded to the officer's comment without any indication that he wished to terminate the conversation, he made his remark in a public place in a residential area, there had been no restrictions on his freedom of movement, the interview had just begun, the officer had not manifested a belief that defendant was culpable of the accusations or that the police had evidence to prove them, and the officer was not aggressive and had not used interrogation techniques to pressure defendant. No evidence was presented regarding whether the officer still retained defendant's driver's license at the time defendant asked where the evidence was.
Having reviewed the combined effect of all the circumstances presented to defendant at the time he made the remark in question, we conclude the circumstances did not create "a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (People v. Aguilera, supra, 51 Cal. App.4th at p. 1162, 59 Cal.Rptr.2d 587.) Having determined that defendant was not in custody when he responded to hearing that two girls had accused him of inappropriately touching them, we conclude Miranda admonitions were not required and the trial court properly concluded defendant's response to the deputy was admissible at trial.

C. Failure to Instruct on Adoptive Admissions
Deputy Dona's statement that two girls had accused defendant of inappropriately touching them and defendant's reply, "Where is the evidence?," were admitted into evidence under Evidence Code section 1221 on the theory that defendant's response could be interpreted as an adoptive admission of guilt as an evasive failure to deny Dona's accusation.
*385 Defendant is correct that, when the prosecution proffers evidence of a possible adoptive admission, the trial court has a sua sponte duty to instruct on adoptive admissions pursuant to CALJIC Nos. 2.71.5 and 2.71 in order to guide the jury's evaluation of that evidence. (See People v. Humphries (1986) 185 Cal.App.3d 1315, 1335-1336, 230 Cal.Rptr. 536; People v. Pensinger (1991) 52 Cal.3d 1210, 1267-1268, 278 Cal.Rptr. 640, 805 P.2d 899;) CJER Mandatory Criminal Jury Instructions Handbook (10th ed.2001, § 2.89, subds.(a) & (b), pp. 73-74.)
"Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction] examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" (People v. Pensinger, supra, 52 Cal.3d at p. 1268, 278 Cal.Rptr. 640, 805 P.2d 899.) In this case, there was no dispute as to whether defendant made the statement or what he said. Accordingly, here, as in Pensinger, we "cannot say that the error in failing to instruct the jury to view admissions and adoptive admissions with caution was substantial or that there is any reasonable possibility that it affected the verdict." (Id. at p. 1269, 278 Cal.Rptr. 640, 805 P.2d 899.)

III. Disposition
The judgment is affirmed.
We concur: ELIA, Acting P.J. and BAMATTRE-MANOUKIAN, J.
NOTES
[1] The charges as to Jane Doe II subsequently were dismissed on the People's motion on grounds of insufficient evidence.
[2] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda).
[3] Throughout her testimony, Jane Doe I refers to this bedroom as her "moms'' room or bedroom.
[4] Our state Supreme Court recently granted review on this issue in People v. Edmonton (2002) 103 Cal.App.4th 557, 126 Cal.Rptr.2d 836 (rev. granted January 22, 2003 (S112168)).
[5] At this hearing, Dona did not say anything about holding onto defendant's driver's license when he mentioned the allegations.